FORSYTH, *appellant,* and CLARK & STEWART, *respondents.*

A conveyance of an estate will not be decreed in chancery where the proof of the equitable title *varies* from that set up in the bill; thus, where a state of facts was alleged in a bill creating a *resulting trust,* and the proof shewed a *subsequent agreement* to convey, *it was held,* that the party was not entitled to relief.

The appropriation of the joint funds of a copartnership by one of the members of a firm to the purchase of real estate conveyed to such partner in his own name will not create a *resulting trust* in favor of his co-partner, unless the funds were so appropriated in pursuance of an agreement between the parties at the time of the purchase.

Where the contracting parties, after a contract for the purchase of an estate and the payment of the consideration money, but before the execution of a deed, conspire together to defraud the creditors of the vendee, it seems a court of chancery, on a bill filed by a creditor, would deem the *equitable title* vested in the vendee, and would not permit the statute of frauds to be interposed as a bar to the setting up of such title.

Where the property of a defendant, sold under an execution, brings a sum equal to or greater than the amount of the judgment, the plaintiff in such judgment can no longer be considered a judgment creditor of such defendant, entitled to the equitable interference of a court of chancery, to set aside a *fraudulent settlement* of accounts between the defendant and a third person.

To enable a court of chancery to set aside as fraudulent a settlement between a defendant in a judgment and a third person, and to order an account, &c. such settlement must be directly charged to have been fraudulent; and all the creditors in such case should be made parties, or an offer made in the bill for them to come in.

ALBANY, Dec. 1829.

Forsyth v. Clark.

An answer in chancery, although responsive to a bill, if impeached in material parts by the proofs in the cause, is, like all other evidence, entitled to only diminished credit.

The priority to which a judgment in favor of the United States is entitled does not extend to create a *prior lien* on real estate; it merely gives a right of prior payment out of the general funds of the debtor in the hands of the assignee.

Appeal from chancery. The appellant filed his bill in chancery to obtain a decree directing the respondent, Daniel P. Clark, to release and convey to him the moiety of the west half of the building in the city of Albany formerly known as the Tontine Coffee House, which the appellant alleged was held *in trust* by Clark for the other respondent, Gilbert Stewart, whose interest in the premises the appellant had acquired as a purchaser at sheriff's and marshal's sales by virtue of executions against Stewart.

It was stated in the bill that Stewart and Clark were copartners in mercantile business from 1810 until 1819; that Stewart advanced a capital of $12,000; that during the two first years of the connection a Mr. Tallmadge was a member of the firm, during which time the business was carried on under the name of "Clark & Tallmadge," and for the residue of the time under the name of "Daniel P. Clark & Co.;" that in July, 1815, Stewart and a Mr. Lansing being the owners of the Tontine Coffee House, agreed to sell the same, and accordingly sold and conveyed the *east* half of the building to Messrs. Webb & Dummer, merchants, trading in Albany, for the sum of $16,000, who paid the amount to Mr. Lansing, and the *west* half they sold and conveyed to the respondent Clark for the like sum; whose *single bond* for the amount was accepted by Stewart. The bill then charged that Stewart was a joint purchaser with Clark, that there was a private arrangement or agreement then or afterwards made between Stewart and Clark that the purchase thus made by Clark should be on their joint account, and that they should be joint owners thereof, and that the deed made to Clark was taken, or afterwards agreed to be taken, and held as a trustee for Stewart, to the extent of Stewart's interest in the same. The bond given by Clark to Stewart for $16,000, was averred to have been delivered up and cancel-

led in January, 1818, without any part thereof having been paid; and it was alleged that in September, 1819, on a settlement of the concerns of Stewart and Clark, the latter was found to be indebted to the former, independent of the interest of Stewart in the house sold, in a large sum of money, specified at $10,000.

It was further stated in the bill that in the month of August, 1819, Stewart declared himself a bankrupt, and made an assignment of his property real and personal to Clark and one John Stewart, junior, for the benefit of certain creditors; that the purchases made by the appellant of the premises in question were made in February, 1822, and July, 1823; the first at a sale under an execution on a judgment in favor of the United States against Stewart, docketed on 11th June, 1821; the second at a sale under an execution on a judgment in favor of the appellant and his partner in trade against Stewart for the sum of 467,63, docketed 22d October, 1819.

The bill stated that the defendants Clark and Stewart pretended at the filing of the bill that the purchase of the house by Clark was on his own account and for his own benefit, and that Stewart had no interest in the mercantile business carried on in the name of "Daniel P. Clark & Co." and concluded by praying a decree compelling Clark and Stewart to release and convey to the complainant (the appellant here) the estate and interest of Stewart in the house, and for general relief.

The defendants below put in their answers to the bill, Clark putting in four answers, (the three last upon exceptions taken to that first put in.) The *trust* set up in the bill was fully denied, as was also the partnership of Stewart, and Clark subsequent to the withdrawal of Tallmadge from the firm. Proofs were taken, from which, amongst other things, it appeared that in September, 1820, Stewart applied to Judge Miller, of Cayuga county, for the benefit of the insolvent law of this state discharging the person of debtors from imprisonment. His discharge was opposed by several creditors. Upon that occasion, the respondents, Clark and Stewart, were both examined under oath, and important disclosures made, as to which, and the other facts in the case

ALBANY, Dec. 1829.

Forsyth v. Clark.

not already stated, the reader is referred to the opinion of Mr. Justice MARCY delivered in this court.

The cause was heard on pleadings and proofs by Chancellor JONES, who, in March, 1828, made a decree dismissing the bill, but without prejudice to a new bill, and without costs; he being of opinion, upon the case made by the bill and the proofs in support of it, that Stewart had not any estate or interest in the premises called the west half of the Tontine Coffee House, in the city of Albany, at the time of becoming insolvent and making the assignment in the pleadings mentioned to trustees for the benefit of his creditors, which could be levied upon and sold by executions on judgments against Stewart, and that by reason thereof the complainant can have no relief upon the bill filed by him as purchaser under the executions in the pleadings mentioned. From this decree the complainant below appealed to this court.

*The appeal here was argued by*

*S. A. Foot*, for the appellant.

*A. Van Vechten & J. V. Henry*, for respondents.

The following opinion was delivered:

By Mr. Justice MARCY. The settlement between Stewart and Clark, made in 1819, was not directly charged as fraudulent in the bill, but its fairness was incidentally involved in the matters that were in issue between the parties, and the evidence that impeached it was properly received and ought not now to be laid out of view. The respondents might have repelled that evidence, if it could be done; and with the opportunity arose their duty to do so. At all events it is not for us to conjecture what different aspect might have been put on the transaction. So far as we are required to look at it, we must look at it as it is presented to us; and so viewing it, we must say that the creditors of Stewart have most abundant reasons to be dissatisfied with the manner in which this business was closed. My investigations on this part of the case terminate in the conclusion, that Stewart

was not only a partner of Clark after Tallmadge retired from the concern until 1819, but had during all that time a large amount of funds therein under the control of Clark.

Clark states, that in part payment of the bond of $16,000 executed by him to Stewart as security for the payment of the consideration money of the west half of the Tontine Coffee-House, he was to procure the discharge of an incumbrance of $7,500 existing on the whole lot at the time of the purchase. This he did in September, 1816, about one year after his purchase, by executing a mortgage of the part of the lot deeded to him for the amount of the former incumbrance, including the interest that had accrued since the purchase, accompanied with his individual bond. Lansing paid to Stewart some time afterwards one half of this incumbrance, which was about $3,750. The bond of $16,000 given by Clark to Stewart for the consideration of the purchase, was delivered up and cancelled without the payment by Clark directly thereon of one dollar, and without Stewart's having received any thing for his interest in the Tontine Coffee-House, except one half the amount of the incumbrance from Lansing. Clark had done nothing towards satisfying that bond but a transfer to the half purchased by him the incumbrance due on the whole lot at the time of the sale, and to give his personal obligation to Roberts for the future payment thereof. For the property purchased by Clark for $16,000, he has paid or become liable to pay the incumbrance of $7,500, which, when it was settled in 1816, amounted to $7,950, and Stewart, who had an interest which was sold for $12,250 beyond his proportion of the incumbrance, has received (and that from Lansing) about $3,750, and the balance amounting to $8,500 remains in the hands of Clark, and all legal claim for it is extinguished, and it is contended by the cancelling of the bond of $16,000 within twelve months of Stewart's bankruptcy; a bankruptcy which leaves him deficient in means to satisfy his creditors to the amount of $70,000. If these transactions are as they appear to be, our system of jurisprudence would merit but little commendation if it was so defective that no relief could be afforded to the defrauded creditors. But with the amplest means of dispens-

ing relief in such cases, it can only be effectually sought in the manner established for administering it. Has the appellant shewed a clear right to relief, and is he seeking it in an allowable way?

Stewart, at the time of his failure, was indebted to Forsyth the appellant in this case, and to his partner, in the sum of $400, for the recovery of which he was prosecuted and a judgment obtained against him in the October term of the supreme court in 1819. Executions were issued thereon soon after, but no property was found to satisfy the debt. In March, 1822, another execution was issued against the real property of Stewart, and the premises purchased by Clark were levied on and sold to the appellant for $550, as the property of Stewart or as property in which he had an interest.

In July, 1813, Stewart became a co-obligor with Josephus B. Stewart and Moses Willard in a bond to the United States, conditioned for the faithful performance of the duties of a paymaster by Josephus B. Stewart. The condition was broken, and Gilbert Stewart, before he assigned his property in 1819, became a debtor to the United States on this bond in the sum of about $7000. For this debt a judgment was recovered against him, and all his interest in the premises formerly conveyed to Clark was sold by the marshal of the northern district of New-York on a *fi. fa.* issued in June, 1821, and the appellant became the purchaser for the sum of five dollars and received a deed therefor in February 1822. These sales and the purchases under them were made *in the belief* that Stewart had a *trust estate* in the premises, and one of the objects of this suit is to obtain a discovery of the trust, and to annul any instrument by which it may have been fraudulently released.

If I am not mistaken in the views I have taken of this case Clark and Stewart combined together to withdraw from the creditors of Stewart a large amount of his effects, and the whole scope of their answers has been to cover up or gloss over their fraudulent conduct. This charge, impeaching as it does the integrity of the respondents and imputing to them fraud extensive in amount and odious in character, should not be lightly made; the examination of the facts brings us,

however unwilling we may be, to this conclusion. A detail of them will not be expected, for it would amount to little less than a repetition of the testimony. Clark's own books shew that he misrepresented the affairs of the company at the time Tallmadge retired from it; the accounts on which the settlement was made in 1819, after Stewart had become insolvent, are grossly incorrect; and the pretences set forth by him as the true motives for abandoning the contract which he admits was made subsequent to the purchase by him, that Stewart should become a joint owner with him in the west half of the Tontine, and on which contract Stewart had paid, by giving up the bond, at the least eight thousand five hundred dollars, are effectually exploded. From answers thus impeached we were urged to withhold all credit; the counsel for the appellant asked us to throw them wholly out of view. He applied to them the maxim, *falsus in uno, falsus in omnibus.* That they have been in several important particulars seriously impeached, is certainly true; and considering them as evidence, I cannot bring my mind to yield them much consideration.

The general doctrine that an answer so far as it is responsive to the bill is evidence for the defendant, cannot be denied. An answer is often of a mixed character; the definition once given of it by a very eminent counsellor in this court is, in my judgment, exceedingly correct. In some respects, he says, it is mere pleading; in others, it is pleading coupled with evidence; and when it is neither, it is merely evidence. (1 Cowen, 745, note.) As pleading, the answers must certainly stand, and the appellant is put to the proof of the facts in issue; as evidence, they ought to be like every other species of evidence liable to be impeached and overthrown. If an answer puts three facts in issue, and the testimony taken in the cause conclusively shewn that as to two of the facts it is false, and that the defendant as to these has wilfully perverted the truth, is the answers to receive the same consideration as evidence in his favor; as to the third fact, as an answer in no respect impeached would be entitled to? I should be inclined to attach to it, in such a case, a credit diminished in proportion as it had been im-

ALBANY, Dec. 1829. Forsyth v. Clark.

peached in other particulars. We are not however, as I think, called on to settle definitely this question; for though the appellant has urged us to lay aside the answers, yet he has occasionally resorted to them for admissions and disclosures found in them favorable to his views. Upon no principle can we wholly reject as evidence what is said in the answer responsive to the bill, in relation to the matters concerning which the appellant has resorted to the answers for admissions in his favor; but they ought not, in my judgment, to have the same weight as evidence in those particulars wherein they are not impeached, as they would command if they had not been discredited in any respect whatever. Circumstances must have in such cases, as they ought to have wherever the effect of conflicting testimony is to be ascertained, a great and preponderating influence.

Under the guidance of these views as to the effect of the answers, I shall now consider the facts relied on by the appellant to shew that Stewart had a trust estate in the west half of what was formerly the Tontine Coffee House in the city of Albany. Clark has a legal title to this property, and claims to be its owner. If a decree is made concerning it, his rights will be thereby affected. The statement of Stewart before Judge Miller, that it was agreed by Clark *at the time of the purchase* that he was to be jointly interested, cannot affect Clark. The answer of one defendant is not evidence against another. (1 Caines' Cas. in Err. 121. 5 Johns. R. 412.) Clark's account of that transaction is, that he purchased the premises for himself only, and gave the bond of $16,000 for the consideration money; that shortly after he fitted up the building for stores, and *about that time* Stewart verbally agreed to take one half, and to be at one half of the expense of the repairs. It further appears, from Clark's examination and answer, that in 1818 he caused a deed to be made out to Stewart of the undivided moiety of the premises purchased by him, but Stewart delayed completing the arrangement until his embarrassment, and then refused to do it principally on the ground of his inability to pay for his part of the repairs. If there had been an agreement at the time of the purchase that Stewart should be interested there-

in to the amount of one half, or in any other proportion, and he had paid a part of the consideration money equal to the proportion he was to have in it, or if a portion of the bond equal to the interest Stewart was to have in the purchase was not to be paid by Clark, a trust would have resulted in favor of Stewart; but Clark, in his answer, denies such to have been the fact, and his statement before Judge Miller, on the occasion of Stewart's application for a discharge as an insolvent debtor, is equivocal and inexplicit. His testimony on that occasion, as stated by one witness, is substantially that a short time after the purchase he made the repairs, and *about that time* Stewart agreed to take one half of the premises: as stated by another witness, it is, that he made the purchase in July, and afterwards altered the building and made the repairs, Stewart having agreed to take one half; *that this agreement was made about the time of making the repairs.* The repairs were made, as appears from other parts of the case, in 1816, nearly or quite a year after the purchase. The fair inference, therefore, to be deduced from the testimony of Clark before Judge Miller, and his answer, is, that the agreement with Stewart to be a joint owner was made subsequent to the purchase in 1815. Do the facts attending the sale and the subsequent conduct of the parties lead to a different conclusion?

The principal circumstances relied on to show such an agreement coeval with the purchase are—

*First,* the taking the single bond of Clark as the only security for the consideration money. It appears that Clark was understood to be without any considerable means when he went into partnership with Stewart and Tallmadge, and his own account of his subsequent success proves that he could not have acquired a great amount of property subsequent to that time and previous to making the purchase. These facts are certainly not of a very conclusive nature. The single fact that a bond was actually given, situated as the parties then were, repels the very inference attempted to be deduced from Stewart's neglect to take adequate security It is not reasonable to suppose that Stewart's insolvency was forseen or even indistinctly anticipated at the period of the

purchase, or that any subsequent event would happen to render it expedient for them to throw a disguise over the transaction; and without some such supposition, the actual giving of the bond by Clark for the full amount of the consideration, and the receiving of an absolute deed, are scarcely reconcileable with the existence of the alleged agreement.

*Second.* The old incumbrance on the Tontine Coffee House before the sale was, as Clark states, to be discharged by him. This he performed, as we have seen, by transferring the amount of it to the part which he purchased. The payment made by Lansing of his half of the incumbrance should have gone into the hands of Clark, and if paid to Stewart for the benefit of Clark, an endorsement should have been made on the bond. It is admitted that no endorsement either on this account or any other was ever made on it. If this fact sheds any light on the transaction of the sale, it is too uncertain to guide us safely to the result at which the appellant wishes to arrive.

*Third.* The cancelling of the bond is relied on with great confidence to shew that it never was given with an intention to be enforced against Clark to its full extent. This transaction, in my opinion, admits of an explanation (hereafter to be noticed) not inconsistent with the fact that Clark was the sole purchaser. The bond was cancelled some time after it was given; Clark says three years after; and this act is as likely to have been done, as he says it was, in fulfilment of a subsequent, as of a cotemporaneous agreement.

*Fourth.* The facts of this case leave in my mind no doubt, as I have before stated, that Stewart was a partner with Clark after Tallmadge withdrew from the company, and continued to be such till about the time of his failure. The funds of the concern were applied in the repairs of the house, and the expenses of transferring the incumbrance came from the same fund. Although these things do not harmonize with Clark's account of the matter, yet they are no better proof of an agreement that Stewart should be concerned in the original purchase, than they are evidence to confirm the statement made by Clark to Judge Miller, that an agree-

ment that Stewart should be interested in the purchase was entered into *at the time the repairs were made.*

*Fifth.* A difficulty more embarrassing than any or all of the foregoing, is the fact that as early as November next after the purchase, before the repairs were commenced, and before the existence of any agreement disclosed by the respondents that Stewart should have an interest in the premises, (except that mentioned by Stewart in his examination before Judge Miller,) the *rents* were carried into the accounts of D. P. Clark & Co. Why should the rents and profits of Clark's building be permitted to mingle with the concerns of Clark and Stewart, if no agreement existed that Stewart was to be or had already become interested in that building? The answer that assumes to account for it on the ground that Clark was ignorant of his actual relation as partner with Stewart, is not at all satisfactory to my mind.

When exploring transactions suspected to be fraudulent, it often becomes necessary to build our conclusions upon an accumulation of circumstances, and such conclusions are strong or weak according to the number and character of the circumstances by which they are sustained. Circumstances which are inconsistent with one state of facts do not, however, necessarily prove another state of facts with which they may be made to harmonize. Combine those with this case presents to us as we may, doubts and difficulties, I apprehend will arise, as to the simple question whether Stewart was a *joint purchaser with Clark* of the west half of the old Tontine Coffee House. Most of the pretences that have been set up in opposition to such a conclusion have been scattered, yet competent proof is still wanting to create in the mind a confident reliance on its truth.

It is contended on the part of the appellant that if Stewart was not a joint purchaser with Clark, he subsequently acquired an interest in the premises. It will be necessary to consider whether such was the case, and if so, whether the interest he did acquire was of such a nature as to be available to the appellant in the manner he seeks to make it available. Both Clark and Stewart admit in their answers that there was an agreement *subsequent to the purchase* by Clark

ALBANY, Dec. 1829.

Forsyth v. Clark.

that they should be jointly interested in the premises. From Clark's disclosures before Judge Miller, this agreement was entered into about the time the repairs were made, which was the year succeeding the sale. In his answer he states that after the purchase, but at what precise time he cannot tell, Stewart wished to take an interest in the premises, but he denies that he then assented to to any arrangement of that kind. He however says that he offered in September, 1818, to convey to Stewart one half of the lot purchased by him on his paying his proportion of the mortgage to Roberts, and of the expenses and interest: but he says Stewart made no decision until about the time of his failure, when he declined to accept it by reason of the depreciation in value of real estate in Albany, and of his pecuniary embarrassments. This statement, it will be observed, conflicts with that which he made on his examination before Judge Miller; for he then admitted there was an agreement about the time the repairs were made (which was in 1816) for Stewart to become a joint owner with him. It is also inconsistent with what he admits in his further answer; for in that he says Stewart proposed to purchase of him an undivided moiety of the west half of the old Tontine ; and that he prepared a conveyance for that purpose, which was to be executed after the adjustment of the expenses of repairs and of the mortgage, which was an incumbrance on the premises ; and that about that time Stewart delivered up the $16,000 bond, and he cancelled it. Taking these disclosures of Clark and uniting them with those circumstances which I have just considered, in relation to the question whether there was an agreement coeval with the first purchase that Stewart should have an interest in it, a bargain is clearly established, and the consideration therefor paid by Stewart. It has not been pretended that the giving up of the bond was not done in fulfilment of this bargain. When it was entered into is quite uncertain. Clark's statements on this point are contradictory. I am inclined to think it existed earlier than he has admitted in his answer, and as early as he stated in his testimony before Judge Miller. There are several reasons for believing that this arrangement was made about the time the incumbrance

ALBANY, Dec. 1829.

Forsyth v. Clark.

was changed, which was in the beginning of September, 1816. On the second of that month Clark endorsed a receipt in full on his deed, which was signed by Stewart. This is stated in the receipt to have been done on a settlement. What settlement could this have been? Not that of the copartnership concerns, for that settlement was not made till 1819. If the bond was in existence and considered of force when this endorsement was made, it was not according to the fact. The existence of the arrangement as early as 1816 explains some of the circumstances which were urged upon our consideration as evidence of an agreeement between the respondents at the time of sale. It may account for the company's being charged with the expenses of the mortgage which Clark gave, and with the $4375 of repairs incurred about this time.

Nothing can be more futile than the reasons which have been assigned for the abandonment of the contract by Stewart. These reasons are, his pecuniary embarrassments and the depreciation of the property. What obstacle did Stewart's pecuniary embarrassments present to its fulfilment? He had nothing to pay. The joint funds of himself and Clark had made the repairs; he had therefore nothing to advance therefor, but if any thing was to be paid on that account, it was going to Clark, who then actually owed him many thousand dollars. The principal of the mortgage to Roberts had not then been called for, and the want of means to pay it presented no difficulty. If it had been called for, it was Clark's debt, and he alone was to pay it. The cancelling of Clark's bond had operated as a payment to him of more than Stewart's proportion of the consideration money. On the adjustment of the accounts, Stewart could not have been required to pay a single dollar, but would have had a just claim against Clark for a considerable balance: for the joint fund of the company had been taken to pay the interest on the mortgage to Roberts which belonged to Clark exclusively to pay. Stewart's embarrassment, therefore, was or should have been an inducement to him to fulfil rather than to abandon the contract. As Stewart had paid more than a moiety of the consideration, and a full moiety of all the expenses for repairs

and of the interest on Clark's mortgage to Roberts, the property must have so far depreciated as to have become entirely worthless before he could have had any motive to abandon the contract on that account. To my view, this pretended abandonment of the contract, resolved on as it was after Stewart's insolvency, and stripped as it was of all the pretences that have been thrown over it, presents nothing but a fraudulent device to deceive Stewart's creditors.

On the 20th of September, 1819, Clark and Stewart came to a settlement, and on that occasion a release was executed by the latter to the former, which, in its language, has no particular reference to any interest Stewart might have in the west half of the Tontine Coffee House, but by its general terms, would convey to Clark whatever right Stewart had therein. One object of the bill was to set this release aside as fraudulent. This would be done without any hesitation, if it stood in the way of any relief the appellant can claim. It was expressly and repeatedly admitted by the respondents counsel on the argument that this instrument had no relation whatever to the real property in question. It is not, therefore, considered as presenting an obstacle to any claim which the appellant may have to that property.

I am therefore brought to the conclusion that Clark, *subsequent*, to his purchase in 1815 of the west half of the Tontine Coffee House, entered into a contract with Stewart for the sale of a moiety thereof; that Stewart, by delivering up Clark's bond for $16,000, actually satisfied him for the consideration agreed to be given therefor; that the subsequent abandonment of the contract (if it in fact ever was abandoned) was an invalid act by reason of its having been done in fraud of Stewart's creditors; and the release executed in 1819 was not designed and should not now be permitted to have the affect of discharging any interest of Stewart in the premises derived from that contract.

We are next to enquire whether Stewart's interest arising from this subsequent purchase, or otherwise, is of such a character as that it could be sold on execution. Where a person purchases and pays his own money for real estate and takes the conveyance thereof in the name of a third person,

a trust results, by implication of law, in favor of the purchaser, without any agreement or understanding to that effect. This well known and undisputed principle has been applied to the present case. It is said Stewart furnished the funds with which Clark made the purchase. This assertion is not borne out by the facts of the case. Clark, in the first instance, used no funds for that purpose; his own bond was substituted for the payment of the consideration money. In discharging the old incumbrance, he used no funds, for that was done by giving his individual bond and mortgage to Roberts. If he afterwards appropriated the funds in his hands belonging jointly to himself and Stewart to discharge the obligations which he had in the first instance laid himself under in making this purchase, a resulting trust would not be thereby created unless it was unequivocally shewn that there was an agreement at the time of the purchase that these funds should be so appropriated. (5 Johns. Ch. R. 1. 2 id. 405.) The interest which Stewart may have in the premises does not, therefore, arise from the appropriation of any portion of his funds at the time of the sale to Clark.

The effect of the subsequent agreement, that Stewart should become a purchaser of a part of the premises, is next to be considered. In the case of *Bogert* v. *Perry and others*, (1 Johns. Ch. R. 52,) the chancellor decided that an interest that could be sold on an execution was not created by a contract to purchase, by the payment of a part of the consideration, and by taking actual possession of the premises; but he strongly intimated that if the contract had been fulfilled, so that the purchaser would have been entitled to a deed at the time judgment was obtained against him, the statute of uses would have applied and vested in him an interest that might have been sold under a judgment. Subsequent to this decision there arose in the supreme court a case very similar to that to which the chancellor supposed the statute would apply: the case of *Jackson, ex dem. Seelye*, v. *Morse*, (16 Johns. R. 197.) By that case it appears that one Beekman had bargained for a lot, and paid the whole consideration money; and that before the deed was given it was sold on an execution against him. The suit was by the purchaser

ALBANY, Dec. 1829. Forsyth v. Clark.

for the recovery of the possession. Ch. J. Spencer observed, in delivering the opinion of the court, that Beekman acquired nothing but an equitable interest in the premises in consequence of his agreement with White, (with whom the contract for the purchase was made,) and the payment of the consideration money. "It is essential, (he said,) from the very words of the statute (of frauds) to a resulting trust, that it should arise from some conveyance or deed." This was purely a case of bargain and sale, which, by the common law, might be made without deed; but since the statute of frauds it is otherwise. (Comyn's Dig. Tit. Uses, D. 1. id. Tit. Bargain and Sale, B. 4.) In a legal point of view any attempt to set up a trust, other than one arising by implication or construction of law, is met and put down by the express provision of that statute which declares that all declarations or creations of trust or confidence of any lands, &c. shall be manifested or proved by some writing signed by the party who is or shall be by law able to declare such trust, or else they shall be utterly void. (1 R. L. 79.) No such writing is shown to exist in this case.

There is an apparent discrepancy between the opinion of Ch. Kent, in the case of *Bogart* v. *Perry*, and that of Ch. J. Spencer, in the case of *Jackson* v. *Morse*. In the latter case it was said that, admitting the whole consideration was paid, the purchaser had nothing but an equitable interest before the deed was executed; in the former the chancellor said the statute of uses might have applied and vested an equitable title in the purchaser, if the whole consideration had been paid. There is, however, no real incompatibility in the doctrine of these decisions. The one proceeds on the ground that there was no fraud, and the other on the assumption of fraud. Lord Hardwicke said he was not bound down by the statute of frauds and perjuries to construe nothing a rusulting trust but what was called trusts by operation of law. (2 *Atk.* 150.) It is the doctrine of equity that frauds beget trusts, and we are strongly urged to raise a trust in this case on such a basis. If there has been a contract that Stewart should become the purchaser of one half of the premises in question, and a performance, or a part performance on his

part, and a refusal by Clark to execute the proper conveyance; or if they have conspired together to defraud the creditors of Stewart, and, in pursuance of such design, have annulled the contract, an equitable title would probably vest in Stewart for what he had purchased, to which a court of equity would not perhaps permit the statute of frauds to be interposed as a bar, for the purpose of defeating it. In equitable contemplation such a contract is executed, because what has been omitted to be done to make it legal and binding has been omitted through fraud.

A further and more serious difficulty in the way of granting the relief asked for in this case arises from the state of the pleadings. The object of this suit, so far at least as the real estate is in question, is to give to the appellant as purchaser of Stewart's title, the same relief that Stewart would have been entitled to if he had been in court, not implicated in any fraud, asking for a specific performance of the contract. The appellant must, therefore, present much the same matter for the consideration of the court as Stewart, to whose rights he has succeeded, would be required to present was he the complainant. He must state with reasonable particularity the contract, a specific performance of which he seeks to have decreed. If that which he set forth in the bill is denied and a different one admitted or established by proof, a decree for the performance of the latter cannot, I apprehend, be entered. In the case of *James* v. *M'Kernon*, in this court, (6 Johns. R. 543,) Spencer, J., observes, that "it is an invariable and universal rule of the court of chancery to ground its decrees on some matter put in issue between the parties by the bill and answer, and the rules and practice of that court require, in forming the bill, that the matter of it be plainly and succinctly alleged with all necessary circumstances, as time, place, manner, and other incidents." Ch. J. Kent, in the same case, says, "it is a settled and well established principle, that the relief must be agreeable to the case made by the bill, and not different from it."

It will be recollected that courts of equity in compelling specific performance, do what is against the letter, and sometimes it has been feared, against the spirit of a statute. Later

ALBANY, Dec. 1829.

Forsyth v. Clark.

decisions have been made with greater caution and more respectful regard to its provisions than were formerly observed. It is very evident from the whole class of cases relative to specific performance, that the agreement to be enforced is required to be very distinctly and particularly stated in the bill. The identical agreement must be admitted or its performance will not be compelled, (Rob. on Frauds, 155;) and evidence to establish it will not be received *aliunde*, unless the decree proceeds upon the principal of part performance. (2 Bro. Ch. R. 566.) Is the contract, the performance of which will be decreed if the appellant prevails in this case, set forth in the bill and put in issue by the answer?

Stewart's title to or interest in the premises purchased by the appellant must result, according to the allegations of the bill, from a private arrangement or agreement entered into between Clark and him *at the sale* by Lansing Stewart, or afterwards, that the purchase should be on joint account, and that they should be joint owners of the property; and that although a deed was given by Stewart and Lansing to Clark for the premises sold, he took, or afterwards agreed to take and hold the same as trustee for Stewart to the extent of his interest, and although Clark gave to Stewart a bond for $16,000, the amount of the purchase money, it was never intended by either him or Stewart that it should be paid. This is the agreement charged in the bill; it is denied in the answer of Clark and Stewart, and, as I have before stated, not satisfactorily proved: no performance can therefore be asked or expected. Nor are the statements of the bill sufficiently comprehensive to embrace the agreement which Clark admits was entered into in 1818. The whole tenor of these statements amount to nothing more than charging an agreement for a joint interest in the premises purchased by Clark in 1815, made cotemporaneously or nearly so with that purchase; and any contract made between them after the first sale was completed, and after the title was absolutely vested in Clark, does not seem to have been contemplated at the time the bill was drawn.

Whether any and what relaxation of the ordinary rules observed in proceedings of this nature, when the contracting

parties are before the court, is to be extended to creditors, to facilitate their attempts to give effect to a contract which their debtor has fraudulently rescinded, I will not undertake to say; but I am very confident that it would be dangerous to compel a performance of a contract not directly and clearly charged in the pleadings. My conclusion is, that if Stewart had a trust estate in any part of the premises purchased in July, 1815, by Clark, that passed to the appellant by the sale under the executions issued against Stewart, the contract from which that interest resulted is not so stated in the bill that this court can properly decree a specific performance of it.

Something was said on the argument about the priority of claim under the judgment of the United States; but this priority in favor of that government has no application to the case before us. It is defined by Judge Story, in the case of *Conrad* v. *The Atlantic Insurance Company*, (1 Peters' Rep. 39,) to be only "a mere right of prior payment out of the general funds of the debtor in the hands of the assignees." It does not amount to a prior *lien on real estate*, and if it did, it could not create a lien on property wherein the debtor of the U. States had no saleable interest.

But the bill in this case extends to objects beyond those I have considered, and seeks relief for the appellant as a creditor of Stewart. Does he sustain that relation? His judgment, which was recovered in October, 1819, amounted to $447,73, and the sum levied by virtue of the execution issued thereon was $550. It was collected in January, 1822, and it no where appears (and indeed a calculation shews that it could not be) that any balance remained due on that judgment after the sale. When the appellant's judgment was satisfied, his character as creditor was thereby annihilated; and without that character he can have no right to investigate the frauds alleged to have been practised by the respondents. I am aware of the provision of our statute, (1 R. L. 504,) which gives a remedy to a purchaser on an execution against the plaintiff or defendant therein, in case he is *evicted* on account of any irregularity in the proceedings, or want of title in the person against whom the execution issued, or by

ALBANY, Dec. 1829.

Forsyth v. Clark.

reason of any prior incumbrance. I will not say that the appellant as purchaser cannot claim the benefit of this statute and recover against Stewart to the amount bid by him, but it is very obvious that his case is not that contemplated by the act. If he is in truth a creditor, he is not a creditor with an unsatisfied judgment.

Admitting him to be a creditor, still there are difficulties in the way of granting the relief sought to be obtained that cannot in my judgment be removed. The general settlement in September, 1819, is not charged in the bill to have been fraudulent. In relation to it, the bill only states that the respondents then accounted together and found a large balance due to Stewart, a balance of ten thousands dollars and upwards, for which, or for a part of it, Clark gave his bond to Stewart. This cannot be understood to be a direct, nor, as I think, an indirect allegation of fraud in the settlement; yet to pretend that it was otherwise than fraudulent could not be done without overlooking a mass of convincing testimony. To set it aside on the ground of fraud before fraud had been explicitly imputed to it by the bill, and perhaps before Clark had considered himself directly called on to sustain its fairness, would, I apprehend, be an unprecedented mode of proceeding. It would be explicitly condemned by the authority of the case of *James* v. *M'Kernon.* There the bill was filed for a general account of moneys received; the answer set up an agreement in relation to these moneys, and the proof was sufficient, as the chancellor supposed, to impeach the agreement on the ground of fraud; he therefore treated it as a nullity. The decision of this court was, that the agreement could not be assailed for fraud, be it ever so clearly made out, because there was no allegation in the bill that it was fraudulent. So this settlement by Stewart and Clark, which professed to adjust all the demands between them, must stand until the fraud imputed to it is put in issue and proved, or admitted by the pleadings.

As all the creditors of Stewart would be entitled to share rateably in the funds belonging to him that should be found on a proper investigation to have been fraudulently placed in the hands of Clark, it appears to me to be a reasonable

suggestion that they should all be made parties to the suit by which these funds are to be reclaimed, or an offer made to them in the bill to come in as parties.

I am free to confess that the respondents now stand before us in an unfavorable light, and it is but reasonable to entertain vehement suspicions of fraudulent conduct on their part; I am also sensible of the many obstacles that creditors must encounter ordinarily in unmasking such conduct, and would not make unreasonable requirements of them. I have carefully searched through the case to find enough in the allegations as well as the proofs to warrant a decree that should restore to the appellant and the creditors of Stewart what there is much reason to believe has been improperly withheld from them. I have stated the difficulties I have encountered, and they are, in my judgment, such as constrain me to decide in favor of an affirmance of the decree in the court below.

Mr. Senator S. Allen also delivered an opinion in favor of an affirmance of the decree of the chancellor.

On the final question, Shall the decree in this case be affirmed or reversed? the members ranged themselves as follows:

*For affirmance*—The Chief Justice, Mr. Justice Marcy, and Senators E. B. Allen, S. Allen, Benton, Hager, Mather, M'Carty, McLean, Oliver, Rexford, Sanford, Stebbins, Throop, Todd and Wheeler.

*For reversal*—Senators Boughton, Enos, Hubbard, McMartin and Woodward.

Whereupon the decree of the chancellor was affirmed, but without costs and without prejudice to a new bill to be filed by the appellant, if he shall be so advised, &c.