The following opinions were delivered:
By Chief Justice Savage.
The question in this case is principally a question of fact, to wit, whether there were but two loans, as the complainant alleges, or whether there were three loans, as stated by J. Jackson.
The bill expressly charges that the two loans of 30th May, and 14th' June, 1826, are the only loans which the complainant procured from J. Jackson. The answer of J. Jackson states, that on the 28th June the complainant applied to him for another loan, and represented himself to be a man of large personal and real estate, and he, J. Jackson, believing such to be the fact, did loan the complainant, over and above the two other loans, the further sum of $5000, and took his note, payable in 45 days, without grace, and without security therefor, and advanced the whole sum. This answer being responsive to the bill, the appellant’s counsel insists is evidence for him, and conclusive against the complainant; there being no testimony to support the bill. That an answer which is responsive to the bill is to be treated as evidence for the defendant, when in his favor, has been held by repeated decisions of this court. Hart v. Ten Eyck, cited 1 Cowen, 743, 4, n. a. Forsyth v. Clark, 3 Wendell, 643. Dunham v. Jackson, 6 id. 30. *But when evidence, it is, like all other evidence, liable to be impeached and contradicted. It is not conclusive against the complainant, provided he can disprove the facts asserted in it. So also its effect, as evidence, must be greatly impaired, if it can be shown that the statements contained in the answer itself are contradic *350 tory, inconsistent or incredible. If this were not so, it would indeed be dangerous to employ the jurisdiction of the court of chancery, as it would enable a fraudulent defendant, by his own oath, to defeat the just demands of the complainant.
It has been well remarked that an answer is sometimes simply a pleading, sometimes evidence only, and sometimes it is both. If we consider it in this case as a pleading simply, it denies the allegations of the bill as to the note of the 28th June, 1826. The bill alleges that the note of that date was a renewal of one given on the 30th May. This is denied, and it devolves upon the complainant to prove his allegations; and until some proof is produced by the complainant, the defendant may safely rely upon his denial of the plaintiff’s charges. The bill, however, not only alleges that the note in question was a renewal of the former one, but charges that the loans of May 30th and June 14th are the only loans which the complainant ever obtained from the defendant, Joseph Jackson; and the bill calls upon J. Jackson to answer whether he ever made any other or different advances to the complainant, and what evidence he has of such advances. In answer to this call, the defendant says, that on the 28th June, he loaned to the complainant $5000, over and above the two previous loans, and took therefor the note in question ; that nothing was retained or received for interest, but that he advanced the whole of the said sum of $5000 to the complainant, leaving the interest thereon to be settled for at the maturity of the note. This being responsive to the interrogatory part of the bill, is evidence, as much so as if the question had come from a witness sworn in the cause, subject, however, to all legal objections but that of competency. How has this evidence been rebutted 1 The fact of the advance of the $5000 is not disproved by any positive testimony. There are circumstances, however, which render doubtful the Correctness of this assertion in the answer. Some of them are as follows : The answer is evasive as to the circumstances of the first loan ; it neither expressly admits nor denies that $300 were taken as interest. Garniss proves that a loan was agreed on at from one and a half to three per cent, per month. Garniss was sent out of the office, that no witness should be present at what J. Jackson pretended to him was a mere sale of stock, at 80 per cent, of its par value— a transaction which he now admits was a loan. A check was drawn on the bank where he kept his account in favor of the complainant, certified by the cashier and endorsed by the complainant, for $5,200. This sum was paid by the North River Bank, through another bank; but to whom it was paid by such bank is not stated, nor does J. Jackson swear that the check was paid to the complainant. It appears that J. Jackson kept an account at the North River Bank, and we have a right to infer that he kept no other account at any other bank. I assume, therefore, that he kept his money, as most men of business do, in a bank; and that as to his funds, they were kept in the North River Bank, and were drawn out by his check when wanted. The cashier states expressly that no check for $5000 was drawn by J. Jackson on the 28th June, 1826, or about that time. How then was the money advanced to the complainant ? Jackson’s money was in the North River Bank, and was not drawn out. It may be said that he may have had other means : that is true; but if so, why does he not show it. J.t does appear that he kept his money at the bank, and that it was not drawn out. This renders the fact of payment very improbable, and, it seems to me, called upon J. Jackson to show how he had paid it. Again, the two first loans were well secured by the assignment or hypothecation of stock, according to the advice of Garniss, who had introduced the complainant to J. Jackson, and who said enough to put him on his *352 guard against loaning money to the complainant without adequate security; yet lie pretends that a third loan was made of $5000, for 45 days, without security and without interest, when he had exacted $300 for the first loan and $200 for the second. The pretence is, that the complainant informed him he was a man of large estate, and he believed it. No title deeds were '^exhibited; no mortgage executed; and we are required to believe that the man who exacted at least three per cent, a month for the first loan, and two and an half per month for the second, had made a third without interest and without security, and to a man whom he knew to be a speculator in stocks, and whom he had been cautioned not to trust. Credulity itself should not be required to give credit to so palpable an absurdity. The thing is incredible. It is, indeed, not impossible, but it is highly improbable that such a man as J. Jackson is shown to be by his previous conduct, should have been guilty of such an act of folly. It was incumbent on him, therefore, when he had related such an improbable story, to have brought some confirmatory fact or circumstantial evidence to his support; but the circumstances are all against him.
As to the first loan, he negotiated with Garniss for from one and a half to three per cent, a month. When the loan was about to be made, he requested G. to retire ; this was natural enough. But G. must have been surprised, on returning to his office, to be informed that no loan had been made, but only a purchase of stock. There was surely no need of secrecy in such a transaction. It is now admitted that the transaction was a loan, and it is not denied that J. Jackson took $300 for the loan of $4700 for thirty days. It follows that J. Jackson gave a false account of the matter to Garniss, and he has the discredit of putting before the court an evasive answer. I have no hesitation, therefore, in saying, that when J. Jackson asserts that on the 28th June, 1826, he loaned to the complainant $5000, without interest and without security, he is not entitled to belief. The fact, then, must be considered as proved that on the 30th May, 1826, W. B. Hart borrowed of J. Jackson $4700 ; that at the same time he paid him $300, and transferred to him 130 shares in the Jefferson Fire Insurance Company, which were to be sold, and the proceeds to be applied to the payment of the loan, if unpaid at maturity. As to this transaction, justice requires that J. Jackson be charged with the amount of the proceeds of the stock and dividends received, with interest, and with the $300, and interest; and that the complainant be charged with $4700 and interest, and that one be set off against the other. A similar ^process in relation to the loan of the 14th June will produce justice between the parties in relation to that transaction. This would be the plain equity of the case, if J. Jackson had retained the stocks and the notes. But the last note he transferred to John I. Hart for a bona fide consideration paid, and the stocks he transferred to D. Jackson for a precedent debt. John I. Hart, being a bona fide holder of the $5000 note, has a right to collect it. D. Jackson has no equities as against the complainant, having paid nothing for the stock, and in fact losing nothing if he loses the stock; he is bound to return the complainant’s property, and account for the dividends received by him, with interest. If he has sold the stock at the market price, he should account for the proceeds, with interest. These, I understand, are the principles of the decree ordered by the vice chancellor and confirmed by the chancellor, and will produce justice between the parties ; the defendant, J. Jackson, being charged with costs. I am therefore in favor of an affirmance of the decree of the court of chancery.
By Senator Tracy. If I could feel myself justified in substituting suspicions for proofs, I should cheerfully concur in the decree of the vice chancel *354 lor in this case ; for the facts alleged in the complainant’s bill exhibit a series of transactions on the part of the defendants which are marked by illegality, fraud and gross oppression ; and the answers put in by them are far from satisfying me that the allegations of the bill are untrue. But on looking through the case, I am not able to find any legal evidence on which to rest a judicial conclusion to this effect. The state of the evidence, so far as it relates to the most material facts in controversy, is that of direct allegation on one side and direct denial on the other. This, to every legal intent, is the absence of all proof necessary to support a decree for relief. Whatever impression, therefore, I may entertain of the real merits* of the complainant’s claim, I am not at liberty to decide in favor of it, except upon principles of evidence that will be applicable to other cases as well as to this.
No rule of equity proceeding is more positively settled than that where there is a single witness only, against the oath of *the defendant in his answer, and the facts denied in the answer are equally strong with those that are affirmed by the witness, that there can be no decree against the defendant on such single evidence. See Walton v. Hobbs, 2 Atk. 19. 18 Vesey, 12, 336. 6 id. 183. Smith v. Brush, 1 Johns. Ch. R. 459. This is the rule where the defendant’s answer is contradicted by the oath of one disinterested witness, and surely it is not less applicable where there is no evidence against the answer, except the oath of the complainant. Indeed, in the present case, it may be said that the complainant, so far from proving his alle•gations, has himself disproved them. He had his election to make or not to make use of the defendant as his witness ; and having elected to make use of him, he is concluded by his testimony, unless he can overcome it by other sufficient and convincing proof.
The most material fact in issue is, whether the complainant made three or only two distinct loans of money of the defendant, Joseph Jackson; that is, whether the note for $5000, given by the complainant on the 28th of June, 1826, and afterwards transferred to the defendant, John I. Hart, was given on a new loan of money, or to renew a former loan made on the 30th of May preceding. The complainant alleges that it was simply a renewal of that loan, while the defendant denies absolutely that it was “for the renewal of the loan first above mentioned, but for a further loan of five thousand dollars ;” and he adds, that “ he did therefore loan to the said complainant the further sum of five thousand dollars over and above the said two other sums so loaned to him as aforesaid.
To overcome this direct and unequivocal denial and assertion of the defendant, the complainant has produced no testimony that, on any safe principle of evidence, can be deemed sufficient. The improbability that the defendant should loan so large a sum as $5000 for forty-five days, without security and without interest, and to a person almost a stranger, of whom he knew nothing, except that he was in pressing want of money, would certainly go far, if the testimony was otherwise nearly balanced, to convince every one of the falsity of the defendant’s statement. But it is not a question of balanced testimony; *it is all, so far as the proof of witnesses is concerned, in one scale. The complainant has voluntarily appealed for the evidence of the fact to the defendant’s oath; and having done so, the evidence thus elicited must be taken for true, unless disproved. The .answer as to this fact is directly responsive to tbe bill, and in a matter necessary for the defendant’s equity; and where this is the case, the complainant is required to produce, not only as much, but as much again evidence to establish his allegation, as if he had" not made a witness of the defendant. There is nothing unreasonable in *355 this ; for if the complainant can prove his case without the aid of the defendant’s oath, he should not call for it; and if he cannot, and the oath is against him, he is only in the situation of any other party who fails from the want of proof necessary to sustain his cause.
It is urged, however, that the defendant’s direct answer on this point is to be discredited, in consequence of his answer being unsatisfactory on some other points. Undoubtedly, if the testimony taken in the case showed conclusively that as to some other facts the answer was false, it would be reasonable and right that the answer should not receive the same consideration in regard to this particular fact. But the difficulty is, if the defendant’s testimony on this point be entirely discredited, it will only leave the complainant without proof any way, in regard to his allegation. He offers no proof to rebut the testimony on this particular point, but merely seeks to discredit his own witness, by way of impeaching his veracity, without otherwise supplying the evidence which he has vainly sought from him, and which evidence he must have from some quarter in order to support his complaint.
The vice chancellor endeavors to remedy the difficulty produced by the defendant’s flat denial that the note for $5000 was for a renewal, by assuming, by way of circumstantial proof, a fact which is as directly disproved as the principal fact; it is, that the first loan was for thirty, and not for sixty days. He remarks : “ Under all the circumstances, and especially taking in connection that the alleged second loan was for precisely the same amount with the first, (deducting the usurious excess,) and was made the day before that loan became due *1 cannot resist the conclusion that it was a renewal of the first loan.” The difficulty I experience in concurring in this conclusion of the vice chancellor is the absence of all proof upon which to rest it. That the second loan was made the day before the first loan became due is no way proved, but on the contrary, most distinctly and particularly denied by the defedant’s answer. The process of reasoning, by which the vice chancellor ap pears to have reached this conclusion, is by first inferring that the loan was for thirty days, because the note was given to renew it, and then inferring that the note must have been to renew it, because it “ was made the day before that loan became due.” The difficulty is the same with both inferences ; they are exactly opposed to the proof.
I agree that the answer, in several respects, is evasive and unsatisfactory, and especially in not stating distinctly whether the check for $5200, which the defendant gave to Hart, was in fact paid to him; and if not, what sum Hart actually received on the first loan ; and also in not stating positively that the first loan had not been paid, and was justly due. But for these defects in the answer, the proper course for the complainant was to except to it, and obtain more direct and positive evidence. By not doing so, he accepted the whole as evidence ; and therefore, as to facts responsive to the bill, which are distinctly asserted by the defendant, and not disproved by the complainant, he is concluded. I feel constrained, therefore, by a necessary and well established principle of law, to dissent from the decree of the vice chancellor, and to vote for reversing the chancellor’s decision affirming that decree.
By Senator Van Schaick. From the-allegations in the bill of complaint, it would seem that Joseph Jackson received from the complainant for interest on the first loan at the rate of six per cent, per month, on the second loan two and a half per cent, per month, and on the third loan three per cent, per month. Garniss, the broker who negotiated the first loan for Hart, says that by the terms of the arrangement between him and Jackson, Hart was to allow to Jackson a premium or rate of interest of from one and a half to three per *357 cent, per month, *but the exact sum for premium or interest he does not recollect; and Wells, the broker employed about the second loan, says that he agreed to pay Jackson from one and a half to two and an half per cent, per month. His impression is that it was two per cent per month. If Garniss’s statement is true, of which I have no doubt, Jackson was to be allowed at the most three per cent, per month. But Hart swears that he took $300 on $5000 for thirty days, which is six per cent, per month. Either Hart consented that Jackson should take six per cent, per month, or Hart’s allegation is false, and the loan was for sixty days at three per cent, per month ; and if it is untrue as to the time, it is also most probably untrue that any note was given by him to Jackson for that loan, and that the bill of sale was the only evidence of the debt. Is it probable that after his own broker had arranged for the loan at from one and a half to three per cent, per month, Hart did allow Jackson to deduct six per cent, per month ? Is it probable that Jackson, with ample security in hand, should ever have thought of exacting six per cent, per month immediately after he had entered into an arrangement with Garniss that the premium was to be from one and a half to three per cent, per month 1 Did Jackson, in the first negotiation, exact six per cent, per month, and on the second loan (fifteen days after the first was made) content himself with taking two and an half per cent, per month ? By what process could Hart induce Jackson to take two and an half per cent, on the second lodh, after he had allowed him six per cent, on the first loan ? If good sense revolts at these suppositions, then it follows that Hart’s allegation as to the time of the loan being thirty days is not to be relied on, and the loan must have been at sixty days; and as the sixty days terminated on the 29th July, and the third loan was made on the 28th June preceding, the third loan could not have been a renewal of the first loan, but must have been a new and distinct loan. This construction appears to me to be natural and necessary, and its coincidence with other circumstances increases its force. By putting the time of the first loan at sixty days, it not only makes the amount of premium paid by Hart agree with the highest rate of premium affixed by Garniss, but it assimilates with the rate *of premium charged on the second loan and related in the testimony of Wells. The bare fact that the third loan was made twenty nine days after the first loan, is not sufficient to substantiate the opinions entertained by the courts below, that the first loan was at thirty days. It has no testimony of any kind to support it, except the allegation in the bill. In this respect it does not stand upon ground as safe as the opposite opinion, which obtains powerful support from, the testimony of the two brokers.
But what has become of the first note 1 Hart alleges, in relation to the third transaction, that he paid Jackson the additional sum of $225, “ before he would consent to take a new promissory note for the first promissory note.” Then Hart took up the first note ! Where is it ? It does not appear. There is no exhibit of it! As the production of that note would have settled the controversy in Hart’s favor, the omission to produce it is of itself nearly conclusive that no such note ever existed. For these reasons, I think that Hart himself has shown that the first discount was made on a loan of $5000 at sixty days ; and the strong probability is that he did not give a note to Jackson on that occasion. Jackson’s answer, that the loan was at sixty days and that no note was given, stands uncontradicted by any proof or circumstance having relation to those facts. The complaint of Hart excepted, there has been no proof revealed, calculated to impeach the possession of the last note in the hands of Jackson. I am therefore of opinion that the last transaction between these parties resulted in a new loan of $5000 from Jackson to Hart.
*359 But as Jackson’s conduct is not free from suspicion, and as he was guilty of duplicity to Garniss in regard to the first loan, it is fair that the case should be stated against him in the strongest light it will bear, for the purpose of ascertaining whether the conclusion to which I have just arrived can be overthrown. In his answer, he says, alluding to the first transaction, that it was a loan of $5200, secured by a transfer of 130 shares in the capital stock of the Jefferson Fire Insurance Company; and he produces his own check, dated 30th May, 1826, for that amount, payable to the order of and endorsed by Hart, and which check was certified by the clerk of *the bank to be good, and paid by him through another bank the day after. He also produced a bill of sale from Hart, receipted by Hart, of the 130 shares of stock, amounting, at 80 per cent., to $5200. It was to the color he had thus given to the bargain, that Jackson alluded when he told Garniss that he had changed the transaction and purchased the stock. Yet Jackson admits, in his answer, that the $5200 was a loan, and further, that in the event of its non-payment, the stock was to be sold and the overplus returned. This, no doubt was an arrangement founded in usury and tending to fraud, but it does not invalidate my previous conclusions; and as Hart consented to it, he ought not to escape a portion of the criminality.
In reference to the third loan, the defendant says, in substance, that on the 28th June, the complainant Hart applied for a “ further loan of $5000,” and that, upon Hart’s own representation that he was a man of large real and personal estate, he lent him the money and took his note at 45 days, without security and without deducting any interest, leaving that to be settled at the maturity of the note. This the chancellor says is incredible. I do not view it so ; because, though Hart appears in the light of a speculator, and was paying ■ an exhorbitant interest, yet there is no testimony that he was not worthy of credit on his own note ; and if Jackson had informed himself that Hart’s circumstances, so far from being bad, were probably good, there was inducement enough for a desperate usurer to take the risk, in the prospect of further gain upon a final settlement. It is admitted that this suggestion leads to no certainty, since it is impossible to trace the tortuous course of men engaged in violating the laws, because a tormenting apprehension of loss constantly urges them to conceal their tracks , but the same objection applies to the chancellor’s conclusion, because his inference is also unsupported by proof, and in that respect, both inferences differ from the objections to the bill of complaint. Garniss testifies that after the first negotiation was completed, Jackson inquired of him as to the standing and credit of Hart, and whether he was good in a pecuniary 5¡oint of view, to which Garniss answered that he knew nothing of lart’s #and advised Jackson to make the loan upon the security of the stock. This witness also testifies “that he would not have trusted Hart $5000 from any knowledge he had of him at that lime,” and also “ that if Joseph Jackson did business with others as he did with the deponent, he, Jackson, would not part with his money before he got security for the same.”
The last loan was made a month after the time to which this testimony applies ; the parties had then become acquainted, for that loan was transacted between themselves. The testimony may or may not be applicable to the state of things between the principals at the period of the last negotiation. But if the words “ at that, time” are significant at all, they show that after that time, he would have trusted him. But put all this testimony on the worst footing, and then here is a dealer in money, by profession keen and by representation cautious, lending a large sum without security to the same person who had *361 twice before borrowed from him two large sums at a heavy premium, but with security, risking his money upon his belief in the representations of the borrower himself, and in opposition to the information of Garniss on a previous occasion; and to this add, that as Jackson produced the check to prove the first loan, so also he should have produced the check, or some evidence of the last loan, in addition to the note; and this requisition seems to be the more reasonable, as Garniss describes Jackson to be a man who, in his transactions with him, has been remarkably prudent, taking a minute of every transaction; and Wells corroborates this opinion of his prudence; and the question then arises—are these facts and circumstances of a nature and quality or of a character and weight sufficient to overcome and destroy, first, the palpable inconsistency in Hart’s bill of complaint as it regards the time for which the first loan was taken, and secondly, the non-production of the first note, for which Hart alleges Jackson took the new note ? These difficulties stand on the threshold of the case, and are not to be rebutted by imputing frauds to Jackson which are mere matters of inference, and which, being admitted, do not explain or remove the objections against the bill of complaint. The difference between *the non-production by Jackson of the check for the last loan and the non-production of the note by Hart is this : that money may be paid by a check, or in other ways; but a note taken up is a very different thing, and in this case, its production being nearly if not absolutely indispensable, some reason should have been assigned for the inability or omission to exhibit evidence so conclusive of the nature of the transaction as that would have been.
As to the false bill of sale and the falsehood which Jackson told Garniss, that he had changed the transaction, they are parts of the same contrivance which might have been invented for the purpose of more perfectly covering the usury, or possibly with the intention of retaining fraudulent possession of the stock. Upon the worst construction it can bear, does this purpose alone, or taken in connection with all the facts and circumstances which make against the defendant, disprove or outweigh the objections to the bill of complaint ? I think not; and therefore, if the note for the third loan was not a renewal of the first loan, but was given for an independent consideration, there was no turpitude in Jackson’s selling that note. But as to the stock, that was attached to the first and second loans, and Jackson had no right to transfer or dispose of it in any other manner than was required by the terms of the agreement. In his hands, it was a trust to pay the debt of Hart, and it was a violation of that trust to part with it for the purpose of securing his own engagements. If Jackson had sold the two parcels of stock when the loans upon which they were hypothecated fell due, he would have done his duty and been in a condition to settle the accounts to which they related. Having exceeded his powers, it is right that he should suffer all the loss consequent upon the injustice of his conduct in the transactions ; and therefore, though in my opinion the decree must be reversed as to the loan of $5000, yet it should be reversed without costs, and Jackson should be charged with the stock, at the price in the market when the first and second loans fell due.
*On the question being put, Shall this decree he reversed? the members of the court voted as follows :
. In the affirmative—Senators Armstrong, Cropsey, Ebwarbs, Fxsic, Gere, Lansing, Macbonalb, Quackenboss, Stower, Stbam, Tracy, Van Schaick, and Westcott—-13.
In the negative—Chief Justice Savage and Senators Cary, Conklin, Deitz, Halsey, and Sherman—6.
*363 Whereupon the respective decrees of the chancellor and vice chancellor were reversed, but without costs of the appeal; and the bill of the complainant in the court below was dismissed, but without costs and without prejudice to the rights of the parties.