### TORRENS v. HAMMOND and another, Trustees, etc.

*(Circuit Court, D. Maryland.   March 9, 1882.)*

1. INSOLVENCY—FUNDS IN HANDS OF ASSIGNEES—NOT ATTACHABLE BY FOREIGN
   CREDITORS.
       The funds in the hands of the assignees, appointed by the court as trustees
   in insolvency proceedings, under state insolvent laws, are not subject to attach-
   ment by non-resident creditors of the insolvent.

2. SAME—VALIDITY OF ASSIGNMENT—RULE OF DECISION.
       The supreme court of the United States having recognized the validity of
   assignments under the state insolvent laws to defeat liens attempted to be
   acquired by non-resident creditors, subsequently attaching; and having decided
   as to such assignments of property within the state that state insolvency laws
   are not repugnant to the federal constitution, which prohibits states from pass-
   ing laws impairing the obligation of contracts,—no reason exists why prior
   decisions of the supreme court of the state, though long acquiesced in, hold-
   ing a contrary doctrine, should continue to be the rule of judicial decision.

3. BANKRUPT ACT—EFFECT ON STATE INSOLVENT LAWS.
       The adoption of the United States bankrupt act merely suspended the opera-
   tion of state insolvent laws.

4. STATE INSOLVENT LAWS—AMENDMENT.
       Where the operation of the state insolvent laws, which have never been
   repealed, is revived by a repeal of the United States bankrupt act, a subsequent
   amendment effected by a repeal of the old law, and at the same instant re-
   enacting it with the amendments incorporated, it cannot be held to prevent
   the continuous operation of the old law.

Attachment on Judgment.

*George E. Nelson,* for plaintiff.

*M. S. Weil* and *Wm. A. Hammond,* for defendants.

MORRIS, D. J.    The plaintiff, Torrens, a citizen of New York, sued
Gallagher, a citizen of Maryland, in the United States circuit court
for Maryland, on a promissory note, dated the seventeenth of January,
1877, and recovered judgment at the November term, 1881.

On July 1, 1881, Gallagher had filed his voluntary petition in
the proper state court, making application for the benefit of the
insolvent laws of Maryland.   On that same day, July 1, 1881, the
garnishees in this case, Hammond and Weil, were appointed trustees,
and the insolvent, under his own hand and seal, and in the form
prescribed by the insolvent laws, conveyed to the trustees, for the
benefit of his creditors, all his property, except such as was by law
exempted.   The trustees took possession of a stock of goods belong-
ing to the insolvent, located in Maryland.

The plaintiff, Torrens, procured an attachment on his judgment

and caused it to be laid in the hands of the trustees on the nineteenth of December, 1881.

When the attachment was laid in their hands, the trustees had, from the proceeds of the sale of the insolvent's stock of goods, an amount sufficient to pay the plaintiff's judgment, but sufficient to pay only a small dividend to the creditors who had filed their claims. The trustees having pleaded *nulla bona*, and shown the above facts in support of their plea, the only question is whether the funds in the hands of an insolvent trustee, under the Maryland insolvent laws, are subject to attachment by a non-resident creditor of the insolvent under the circumstances stated. This question has been several times before the court of appeals of Maryland, and in that court it has been held that under the provisions of the constitution of the United States the state insolvent laws are, as to non-resident creditors, to be treated as nullities, and that when attached by a non-resident creditor the funds in the hands of the insolvent assignee are to be considered as still the money of the insolvent and liable to the attachment. *Evans* v. *Sprigg*, 2 Md. 457; *Poe* v. *Duck*, 5 Md. 1; *Glenn* v. *Glass Co.* 7 Md. 287. This has been so long acquiesced in as settled law in Maryland, that I should not have regarded the question as open for discussion but for the decision of the supreme court in the case of *Kelly* v. *Crapo*, 16 Wall. 610. This decision is subsequent to the decisions in the court of appeals of Maryland, and they cannot, it seems to me, be reconciled with it.

In the rulings made by the Maryland state courts denying the efficacy of assignments under the state insolvent laws to defeat liens subsequently sought to be acquired by non-resident creditors, their decisions were controlled by the clause in the constitution of the United States prohibiting any state from passing a law impairing the obligation of contracts, and by the construction put upon that clause by the supreme court as then understood. It is not, therefore, a question of the construction of the state statute, but a federal question, which it is the province of the supreme court to conclusively determine.

Until the case of *Crapo* v. *Kelly*, 16 Wall. 610, there is no decision in the supreme court (except, perhaps, *Bank of Tennessee* v. *Horn*, 17 How. 157) in which the court was required to pass upon the validity of an assignment in insolvency as against a non-resident creditor subsequently attaching within the state in which the insolvent proceedings were had. Mr. Justice Woodbury, in 1846, in

*Manuf'g Co.* v. *Brown*, 2 Woodl. & M. 449, held, at circuit, that even the title of an officer of the insolvent court of Massachusetts, conferred by an order to take possession, where no actual possession had been taken, was sufficient to preserve the property of the insolvent within the state from attachment, after the commencement of the insolvent proceedings by a non-resident creditor.

In Maryland weight has been given to the supposed assent of Chief Justice Taney to a contrary doctrine in his opinion in *White* v. *Winn*, a report of which is printed in 8 Gill. 499. It is obvious, however, that what is there said by the chief justice on that point is said rather by way of argument and illustration than as statement of the law, and that no such ruling was necessary in the case as he disposed of it. In the case before him the non-resident creditor, having obtained judgment in the United States circuit court, had laid an attachment in the hands of insolvent trustees, who had also previously been trustees under a voluntary conventional deed of trust from the insolvents for the benefit of creditors. The voluntary deed of trust was valid except as forbidden by the insolvent law. The chief justice says, in substance: "Granting that the non-resident creditors may deny the validity of the proceedings under the insolvent law, the voluntary deed of trust will afford a sufficient protection against them. If they insist that the deed is avoided by the provisions of the insolvent law, they must claim under the permanent trustees' such interest only as by that law is awarded to them." He gave judgment against the claim of the attaching creditors.

That Chief Justice Taney had no disposition to extend the scope of the decisions which had been arrived at, after so much conflict of opinion, in the supreme court with regard to state insolvent laws, so as to further restrict the effect and operation of such laws, is to be plainly seen in his dissenting opinion in *Cook* v. *Moffat*, 5 How. 310, in which he states his individual opinion to be that the discharge of the individual should be held valid as to all debts, foreign as well as domestic, in every court within the state in which the discharge is granted.

The supreme court, in *Ogden* v. *Saunders*, 12 Vt. 358, had decided—

"(1) That the power given to the United States to pass bankrupt laws is not exclusive. (2) That the fair and ordinary exercise of that power by the states does not necessarily involve a violation of the obligation of contracts, *multo fortiori* of posterior contracts. (3) But when in the exercise of that power the states pass beyond their own limits and the rights of their own cit-

izens, and act upon the rights of citizens of other states, there arises a conflict of sovereign power, and a collision with the judicial powers granted to the United States, which renders the exercise of such a power incompatible with the rights of other states, and with the constitution of the United States."

The chief justice gives his assent to the first two propositions, but with regard to the third he says:

"When the two clauses in the constitution referred to in the first two propositions are held to be no restriction, express or implied, upon the power of the state to pass bankrupt laws, I cannot see how such laws can be regarded as a violation of the constitution of the United States, upon the grounds stated in the third proposition. For bankrupt laws, in the nature of things can have no force or operation beyond the limits of the state or nation by which they are passed, except by the comity of other states or nations; and it is difficult, therefore, to perceive how the bankrupt law of a state can be incompatible with the rights of other states, or come into collision with the judicial powers granted to the general government. According to established principles of jurisprudence such laws have always been held valid and binding within the territorial limits of the state by which they are passed, although they may act upon contracts made in another country, or upon the citizens of another nation; and they have never been considered on that account as an infringe-ment upon the rights of other nations or their citizens. But beyond the limits of the state they have no force except such as may be given to them by comity."

Although as to discharges under state insolvent laws the views of Chief Justice Taney were never adopted by the supreme court, and such discharges have never been held valid in any court against non-resident creditors who had not made themselves parties to the proceedings in the insolvent court, yet there certainly has been an increasing disposition to adopt the reasoning of the chief justice, and to refer the inefficacy of the state insolvent laws, as to debts due non-residents contracted after their enactment, to the general want of any extraterritorial force in all bankrupt laws, and not to the prohibition of the constitution of the United States against state laws impairing the obligation of contracts. This appears in the reasoning of Mr. Justice Clifford, in delivering the opinion of the supreme court in *Baldwin* v. *Hale*, 1 Wall. 223, 234. He says that, since the decision of the case of *Ogden* v. *Saunders*, whenever the question of the effect of state insolvent discharges has been before that court the answer has uniformly been that the question depended upon citizenship; and in summing up the ground of the judgment he was then announcing he states it to be that the "insolvent laws of one state cannot discharge the contracts of citizens of other states, because

they have no extraterritorial operation." See, also, Story, Confl. Laws, (7th Ed.) § 341a; *Booth* v. *Clark*, 17 How. 337.

The acceptance of this as the true ground to which the previous decisions of the supreme court upon state insolvent laws are to be referred, prepares us to understand why it was in *Crapo* v. *Kelly* that the only question seriously litigated was whether or not the ship, which was the property attached by the non-resident creditor, was to be considered at the date of the assignment in insolvency within the territory of the state in which the insolvent proceedings were had. No question of the unconstitutionality of the law was raised or considered. The facts of the case of *Crapo* v. *Kelly* were, substantially, that the insolvent, a citizen of Massachusetts, being the owner of a vessel then in the Pacific ocean, applied to the insolvent court of Massachusetts for the benefit of the insolvent laws of that state, and the judge of the court, acting under the state statute, executed and delivered to Crapo an assignment of all the property of the insolvent. About two months afterwards, and while the ship was still at sea, a New York creditor of the insolvent entered suit against him in a court of the state of New York, and by reason of the non-residence of the insolvent procured a writ of attachment against his property.

Shortly afterwards the ship arrived at the port of New York, direct from the Pacific ocean, and was seized by the sheriff, by virtue of the writ of attachment. Crapo, the assignee, appeared two days later, and claimed the ship, notwithstanding the attachment. The question thus raised was carried to the highest court of the State of New York, (45 N. Y. 86,) and was there decided in favor of the attaching creditor, that court upholding the right of the New York creditor, and denying the claim of the Massachusetts assignee in insolvency to take the property from the sheriff. This judgment of the New York court of appeals was removed into the supreme court of the United States, upon writ of error, for review; Crapo representing the title under the Massachusetts proceeding in insolvency, and Kelly the claim under the New York attachment. The sole question was which had the better title.

Mr. Justice Hunt, delivering the opinion of the supreme court, said:

"Certain propositions relating to the question are not disputed: (1) If the assignment under which Crapo claims had been the personal act of the insolvent, it would have passed the title to the vessel, wherever she might have been at the time of its execution. (2) If the vessel, at the time of the execution of the assignment, had been within the territorial limits of Massachu-

setts, the assignment, although not the personal act of the insolvent, would have divested his title, and that of all persons claiming under him, provided diligence has been used to reduce the vessel to possession. (3) If the vessel had been in the port of New York at the time of the execution of the insolvent assignment, (there being no personal assignment,) and had subsequently been seized there, under attachment proceedings, by a New York creditor, such attachment proceedings would have held the vessel as against the prior insolvent assignment.

"The first of these propositions results from the facts that personal property, wherever it may be, is under the personal control of its owner, and the title passes by his actual transfer. The second is based upon the idea that the property, being actually present, and under the control of the law, passes by act of the law. The third proposition assumes that a transfer by legal proceedings possesses less solemnity than one by the owner himself; that each nation is entitled to protect its own citizens; and that the remedy by law, taken by its citizens having the actual possession of the *corpus*, ought to prevail over a title by law from another State, which is not accompanied by such possession. This principle authorizes the Massachusetts assignee to hold the property when in Massachusetts, and the New York creditor to seize it when it is in New York, under the circumstances stated. The present case is deficient in each of the elements necessary to bring the vessel within the range of the foregoing principles. She was not transferred by the personal act of the owner. She was not literally within the territory of Massachusetts when the insolvent assignment took effect; and, thirdly, she was not in the port of New York. The question then arises, while thus upon the high seas was she in law within the territory of Massachusetts? If she was. the insolvent title will prevail."

The remainder of the opinion is devoted principally to the discussion of the question of the legal *situs* of the ship at the time of the execution of the assignment by the Massachusetts insolvent court. The conclusion arrived at is thus stated:

"We are of the opinion, for the purpose we are considering, that the ship was a portion of the territory of Massachusetts, and the assignment by the insolvent court of that state passed the title to her in the same manner and to the like effect as if she had been physically within the bounds of that state when the assignment was executed. * * * If the title passed to the insolvent assignees it passed *eo instanti* the assignment was executed. It took effect then, or never. The return of the vessel to America, her arrival in the port of New York, her seizure and sale there, did nor operate to divest a title already complete."

Mr. Justice Clifford concurred in the judgment of the court, but did not assent to the ground on which the judgment was based in the opinion from which the foregoing quotations are taken. It was his opinion that the ship was a vessel of the United States, and not of Massachusetts; and that when, by the law of nations, vessels were said to remain

a portion of the territory of the state of which the owner was a citizen, the nation was meant, and not any subdivision of it. He concurred, however, in the judgment of the supreme court, and the reversal of the court of appeals of New York, upon the ground that, as the owner of a ship at sea can sell and make a valid transfer of title to her without delivery, delivery being impossible, and that as the deed executed by the judge of the insolvent court was intended to assign and convey all the property of the insolvent as fully as he himself could have done, that the effect of the assignment was to vest in the assignee an absolute and perfected title to the ship, which the subsequent attachment upon her arrival in New York could not divest.

Two of the justices of the supreme court dissented from the judgment of the court, but not upon grounds which at all weakened the decision in its application to the case now before me. They held that the fiction with regard to the *situs* of the ship, by which, although upon the high seas, she might be considered as still part of the territory and within the jurisdiction of Massachusetts, was but a fiction of law, and such as had never been allowed when its effect would be to give extraterritorial force to insolvent laws; that insolvent laws having no extraterritorial force except by comity, such comity was never exercised to the prejudice of the citizens of the state which accorded it. Mr. Justice Bradley, who delivered the dissenting opinion, said:

"I do not deny that if the property had been within Massachusetts jurisdiction when the assignment passed, the property would have been *ipso facto* transferred to the assignee by the laws of Massachusetts *proprio vigore*, and, being actually transferred and vested, would have been respected the world over."

The report of *Crapo* v. *Kelly* shows that neither by the eminent counsel who argued the case, nor by any of the learned justices who expressed their views upon it, was it ever questioned that if the chattel which was the subject of the attachment had been at the date of the assignment within the state of Massachusetts, the title would have passed to the insolvent assignee so that no subsequent attachment could have prevailed against it.

The contrary decisions in the court of appeals of Maryland were the result of the construction of the federal constitution which prevailed in that court when those decisions were made, and when it appeared that the *lex rei sitæ* must yield to its prohibition; but the supreme court having differently interpreted the constitution, there would seem no reason why those rulings should continue to be the

law of Maryland. Certainly it is more consonant with equity that the insolvent assignee should not collect the assets of the insolvent merely to have them wrested from him by the non-resident creditor, and that the domestic creditor should not be compelled to submit to have his claim discharged while another seizes the entire fund which was the consideration of his giving it up.

The only other point made before me on behalf of the attaching creditor was that the state law was passed subsequent to the date of the contract on which the judgment was recovered, and therefore as to him a nullity. How this might affect the case, if true, it is not necessary to decide, as I do not find it to be the fact.

The legislature of 1880 did materially amend some provisions of the state insolvent law, but the act of that session was, so far as the insolvent proceedings produced in this case are concerned, an amendment merely. The state insolvent laws, although suspended during the period the United States bankrupt acts were in force, have been upon the statute book at least since 1854. The form in which, for convenience in codifying, amendments are usually framed by the legislature of Maryland,—that is, by repealing the old law and at the same instant re-enacting it with the amendment incorporated,—has never been held to prevent the continuous operation of the old law. *Dashiell* v. *City of Baltimore*, 45 Md. 624. As to voluntary petitions in insolvency,—and the proceedings produced in evidence in this case are of that class,—the old law has remained substantially unchanged by the act of 1880.

Judgment for the garnishees.